[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 15-14544
_____

D.C. Docket No. 2:15-cv-00029-JES; 8:13-bkc-14831-FMD

In re: CECIL DAUGHTREY, JR.,
        PATRICIA A. DAUGHTREY,

                                                        Debtors.
_____

CECIL DAUGHTREY, JR.,
PATRICIA A. DAUGHTREY,

                                                        Plaintiffs-Appellants,

versus

LUIS E. RIVERA, II,

                                                        Defendant-Appellee.
_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(July 24, 2018)

Before TJOFLAT, ROSENBAUM and SENTELLE,* Circuit Judges.

_____

*The Honorable David Bryan Sentelle, United States Circuit Judge for the District of
Columbia Circuit, sitting by designation.

TJOFLAT, Circuit Judge:

In this case, Cecil and Patricia Daughtrey filed a Chapter 7 bankruptcy petition for the sole purpose of preventing the sale of their property in a public auction to be held pursuant to a state court judgment that foreclosed the mortgage on the property. After the public auction was automatically stayed under 11 U.S.C. § 362(a), the trustee of the bankruptcy estate and the judgment creditor, 72 Partners, LLC, entered into a compromise agreement that would grant 72 Partners all of the property except for a portion the Daughtreys would retain as their homestead. The Daughtreys objected to the compromise agreement and moved the Bankruptcy Court to convert their Chapter 7 case to a Chapter 11 proceeding on the representation that the property (with the exception of the homestead) could be sold for a sum substantially in excess of the judgment. The Court, concluding that the Daughtreys could not qualify as Chapter 11 debtors, denied their motion and approved the compromise agreement.

Before us now is the Daughtreys' appeal of the District Court's affirmance of the Bankruptcy Court's decisions denying the motion to convert the case and approving the compromise agreement. We find no merit in their appeal, and accordingly affirm.

2

I.

The Daughtreys ("Debtors") employed in succession seven law firms in their mortgage foreclosure case and three firms in the bankruptcy proceeding. The litigation has been protracted and contentious. That said, we begin our discussion with the entry of the final judgment in the mortgage foreclosure case and the filing of Debtors' Chapter 7 petition. From there, we follow the strategies Debtors' lawyers took to thwart 72 Partners' ("Creditor") effort to obtain satisfaction of its judgment.

A.

The property consists of 2,500 acres of real estate in Sarasota County, Florida (the "Property"), most of which Mr. Daughtrey inherited from his father.[1] This acreage is used mainly to grow sod and for cattle grazing. On June 8, 2010, Debtors obtained a two-year loan for $2,371,840 from BSLF Holdings, LLC, and secured it with a mortgage on the Property. The mortgage note carried an interest rate of 13.5% per annum payable quarterly. It was a "balloon mortgage," in that the principal, $2,371,840 (plus any unpaid interest), was due at maturity.

---

[1] Mr. Daughtrey received the Property from his father's estate on November 8, 1991. "Personal Representative's Distributive Deed," Sarasota Cty. Official Records, Book 2343 pp. 500–02, *available at* https://www.sarasotaclerk.com/OfficialRecords.aspx. The record indicates that the Property consisted of a fraction less than 2,500 acres. For convenience, we treat the Property as consisting of 2,500 acres.

Debtors made the first interest payment on September 8, 2010, in the sum of $80,049. After they failed to make the payments due on December 8, 2010 and March 8, 2011, BSLF declared the loan in default and on May 25, 2011 brought suit in the Sarasota County Circuit Court to foreclose the mortgage.[2] On July 20, 2011, while the case was pending, BSLF assigned the note and mortgage to Creditor.

On May 16, 2013, the Circuit Court entered an order scheduling the case for trial on October 14, 2013.[3] When court convened for the trial that day, Debtors failed to appear.[4] The trial therefore proceeded without them,[5] and the Court,

---

[2] Verified Complaint, *BSLF v. Cecil Daughtrey, Jr., et al.*, Case No. 2011-CA-4209 NC. Some of the pleadings in the case are contained in the record of the instant bankruptcy case. The clerk's docket for No. 2011-CA-004209 NC is online at sarasotaclerk.com/CaseInfo.aspx. We take judicial notice of the docket entries in this mortgage foreclosure case and of the documents the entries identify in this footnote and in succeeding footnotes.

[3] Order Setting Case for Residential Mortgage Foreclosure Non-Jury Trial, 2011-CA-004209 NC.

[4] Nor did an attorney appear who purported to represent Debtors. Debtors had fired their attorney, Michael J. Owen, on August 19, 2013, less than two months prior to the October 14 trial date. Mr. Owen was the sixth attorney to represent Debtors in the case. He noted his appearance as their counsel on May 13, 2013. On August 20, the day after he was discharged, he moved the Court for leave to withdraw. The Court granted his motion on August 29, 2013. Copies of his motion and the Court's order were mailed to Debtors at the address of their residence.

[5] Court Appearance Record, 2011-CA-004209 NC. BSLF's verified amended complaint and Debtors' amended answer framed the issues to be tried. The amended complaint contained six counts. Count I sought a judgment of foreclosure; Count II a judgment for the amount due on the note, interest and attorney's fees; Counts III–V the recovery of fraudulent transfers; and Count VI the imposition of a constructive trust. *See* Verified Amended Complaint, 2011-CA-004209 NC. Debtors' amended answer denied that the mortgage loan was in default, asserted eleven affirmative defenses, and contained a six-count counterclaim. When they filed their Chapter 7 petition, Debtors listed "Count VI-Civil RICO" as a personal property asset in the

4

based on Creditor's submission, entered a final judgment of foreclosure in the sum of $4,267,436.[6]  The judgment provided that if Debtors failed to satisfy the judgment, the Property would be sold at a public auction held on November 18, 2013.

On October 24, 2013, Debtors moved the Circuit Court to set aside the judgment of foreclosure and for a new trial.[7]  Two weeks later, on November 7, in an effort to stay the public auction and proceeding without counsel, they petitioned the Bankruptcy Court for relief under Chapter 7 of the Bankruptcy Code.[8]  Under 11 U.S.C. § 362(a), the filing of the petition operated automatically to stay the public auction scheduled for November 18.  Debtors disclosed their assets, income

---

appended Schedule B.  *See infra* note 8 and accompanying text.  Count VI-Civil RICO, brought under the "Civil Remedies for Criminal Practices Act," alleged that BSLF and Creditor conspired to acquire an interest in the Property through a pattern of criminal activity or through the collection of an unlawful debt.

[6] This amount included the defaulted quarterly interest payments.  The judgment fixed the post-judgment interest rate at 4.75% per annum.  The final judgment of foreclosure adjudicated in Creditor's favor all of the defenses and the six counterclaim counts asserted in Debtors' amended answer.

[7] Debtors' newly engaged attorney, Arthur R. Rosenberg, noted his appearance in the case and filed the motion.  The motion sought relief from the judgment of foreclosure because Debtors "lack[ed] knowledge of the pending trial date of October 14, 2013."  This was Mr. Rosenberg's only appearance as Debtors' counsel in the foreclosure action.  He was replaced by Eric A. Lanigan on February 7, 2014.  *See infra* note 19 and accompanying text.

[8] On page 1 of the Chapter 7 petition, Debtors, responding to the question, "Nature of Business," stated: "Development & Water Supply."  In estimating respectively the number of creditors, the value of their assets, and the value of their liabilities, Debtors checked boxes for "1-49," "$50,000,001 to $100 million," and "$1,000,001 to $10 million."

On November 8, 2013, a "suggestion of bankruptcy" notation was entered on the Circuit Court's docket for the mortgage foreclosure case.

and expenses, and creditors' claims in the following schedules appended to their petition.  Schedule A - Real Property listed the Property as an asset, describing it as "Residential/Commercial," representing that it had a value of $70 million, and claiming that it was subject to a homestead exemption under the Florida Constitution.[9]  Schedule B - Personal Property listed the following assets and their current values[10]: "Gilberti Water Company & LandTech Design Engineering Group - Florida," $5.125 million; "Water and Mineral rights on property," $50 million; and "Sarasota Case with RICO counterclaim . . . for predatory loan to steal

---

[9] Schedule C.  Article X of the Florida Constitution provides as follows in Section 4, Homestead; exemptions:

> (a) There shall be exempt from forced sale under process of any court, and no judgment, decree or execution shall be a lien thereon, except for the payment of taxes and assessments thereon, obligations contracted for the purchase, improvement or repair thereof, or obligations contracted for house, field or other labor performed on the realty, the following property owned by a natural person:

> (1) a homestead, if located outside a municipality, to the extent of one hundred sixty acres of contiguous land and improvements thereon, which shall not be reduced without the owner's consent by reason of subsequent inclusion in a municipality; or if located within a municipality, to the extent of one-half acre of contiguous land, upon which the exemption shall be limited to the residence of the owner or the owner's family. . . .

Fla. Const. art. X § 4(a)(1).

[10] The Schedule B form requires the debtor to list the personal property by "Type of Property."   The form lists 35 types or categories.  For example, type 1 asks whether the debtor has "Cash on hand," 2, "Checking, savings or other financial accounts," 9, "Interests in insurance policies," 10, "Annuities," 12, "Interest in IRA, ERISA, Keogh, or other pension or profit sharing plans," 13, "Stock interests in incorporated and unincorporated businesses," 15, "Government and corporate bonds and other negotiable and non-negotiable instruments," 16, "Accounts receivable," and 18, "[L]iquidated debts owed to debtor including tax refunds." Debtors checked "None" in responding to these types.

6

Water rights," $15 million.[11]  Schedule D - Creditors Holding Secured Claims listed Creditor with a claim of $4,267,436, which was "[i]nvalid" because the judgment on which it was itself based was a "predatory loan";[12]  and Gilberti Water Company, with a claim of $10,250,000.[13]  Schedules E - Creditors Holding Unsecured Priority Claim, and F - Creditors Holding Unsecured Nonpriority Claims, both listed Creditor with a claim of $4,267,436.[14]

Schedule G - Executory Contracts and Unexpired Leases listed a contract with "LandTech Design Group, Inc," for "Consultanting, [sic] Planning and Civil Engineering permits for Water Supply and Development projects."  Schedule I - Current Income of Individual Debtor(s) estimated Debtors' monthly income to be: "Debtor" $2,000, "Spouse" $200.  Schedule J - Current Expenditures of Individual Debtor(s), estimated Debtors' average monthly expenses to be $2,200, excluding taxes and insurance premiums.

---

[11] Schedule B also listed several personal items, such as a "Dodge SUV."  The "Sarasota Case" referred to in the schedule was the mortgage foreclosure action in the Sarasota County Circuit Court.

[12] Debtors refer to the RICO claim in the mortgage foreclosure action.  They asserted the invalidity of the loan in the answer and counterclaim they filed in that action.  *See supra* note 3.

[13] The Gilberti Water Company's claim was secured by a "Professional lien on entire 7 parcels," which constituted the Property.  Joseph Gilberti, the company's owner, recorded the liens with the Clerk of the Sarasota County Circuit Court on December 28, 2012.  The liens were inferior to the lis pendens BSLF had recorded on the Property prior to its commencement of the mortgage foreclosure action.

[14] No other creditor having an unsecured priority claim or an unsecured nonpriority claim was identified.

The Bankruptcy Court appointed Luis E. Rivera trustee of the bankruptcy estate (the "Trustee").  Meanwhile, on November 12, Creditor moved the Court to lift the § 362(a) stay pursuant to 11 U.S.C. § 362(d).[15]  The Court granted the motion on December 9, 2013.[16]  The next day, an attorney, David Lampley, filed a notice of appearance as Debtors' counsel.

The Trustee scheduled an 11 U.S.C. § 341 meeting of creditors for December 12, 2013.[17]  Neither Debtors nor their attorney appeared, so the Trustee rescheduled the meeting for January 8, 2014.  Again, Debtors and their attorney failed to appear, and the meeting was rescheduled for February 19, 2014.

Meanwhile, on January 10, 2014, the Circuit Court denied Debtors' October 24 motion to set aside the judgment of foreclosure and for a new trial and scheduled the public auction for March 11, 2014.[18]  On February 7, 2014, Eric A.

---

[15] Debtors did not respond to Creditor's motion, nor did the Trustee (since Creditor was the only creditor Debtors had identified).

On December 11, 2013, the following notation was entered on the docket for the mortgage foreclosure case: "Notice of filing – order granting motion for relief from automatic stay."  A second docket entry noted the filing of Creditor's "motion to reschedule foreclosure sale."

[16] The Bankruptcy Court granted the motion pursuant to the Court's Local Rule 2002-4. The rule authorizes the granting of relief from an automatic stay if no party in interest objects.

[17] 11 U.S.C. § 341 provides that "[w]ithin a reasonable time after the order for relief in a case under this title, the United States trustee shall convene and preside at a meeting of creditors."

[18] On January 10, 2014, docket entries in the mortgage foreclosure case noted: "Order denying Defendant's amended [October 24, 2013] motion to set aside final judgment of foreclosure and grant new trial"; "Order – rescheduling sale"; and "Judicial sale set for

Lanigan noted his appearance as Debtors' counsel in the foreclosure action and filed a notice of appeal to challenge the Circuit Court's judgment of October 14 and its ruling of January 10 in the Florida District Court of Appeal, Second District ("2DCA").[19]

On February 20 Debtors, accompanied by their bankruptcy lawyer, Mr. Lampley, appeared at the meeting of creditors and were examined. During the course of the meeting, it became apparent that the Property was worth nothing close to Debtors' $70 million valuation, but might have some value in excess of the judgment Creditor held. After consulting a real estate agent, the Trustee had reason to believe that the Property had a value in the range of $6 to $12 million. The Trustee, through counsel, therefore moved the Bankruptcy Court to reconsider its December 9, 2013 order granting Creditor relief from the § 362(a) stay.

---

3/11/2014 at 9:00 am in Online, Jdg: Judicial Sales." Docket entries on January 17, 2014, noted: "Notice of sale." An entry on January 31, 2014 noted: "Proof of publication of sale."

The lifting of the automatic stay enabled the Sarasota County Circuit Court to rule on Debtors' October 24 motion and to reschedule the public auction.

[19] The docket in the mortgage foreclosure case contains these entries. February 7, 2014, "Notice of appearance [by Eric A. Lanigan] – on behalf of Cecil Daughtrey, Jr; Patricia A. Daughtrey"; "Notice of appeal"; "Forward notice of appeal to appellate court." February 11, 2014, "Acknowledgment by appellate court of new appeal case 2D14-595"; "Order from district court of appeals 2D14-595." The 2DCA clerk's docket is online at onlinedocketsdca.flcourts.org. The appeal appears as *Cecil Daughtrey, Jr. and Patricia A. Daughtrey v. 72 Partners, LLC*, Case No. 2D14-595, August 25, 2014. The 2DCA docket for the appeal is available at http://www.onlinedocketsdca.flcourts.org. We take judicial notice of the docket entries and of the documents the entries identified in this and succeeding footnotes.

The Bankruptcy Court heard the motion at a hearing held on March 3.[20]  At the conclusion of the hearing, the Court granted the motion and reinstated the stay.[21]  The Court also scheduled an evidentiary hearing for April 16 for the purpose of determining the value of the Property and, thus, whether the bankruptcy estate had any equity in the Property.  On March 5, Mr. Lampley moved the Court for leave to withdraw as Debtors' counsel.[22]

On April 1, the Trustee objected to Debtors' assertion that the Property, in its entirety, was subject to a homestead exemption, contending that the Florida Constitution, Article X, § 4(a)(1), limited their exemption to 160 acres.  Debtors did not respond to the objection, and the Court sustained it, limiting the homestead exemption to 160 acres.

On April 8, the Bankruptcy Court granted Mr. Lampley's motion for leave to withdraw as Debtors' counsel.  Three days later, the Court continued the April

[20] Joseph Gilberti was among those attending the March 3 hearing.  He identified himself as "the engineer of record for the Daughtrey ranch."

[21] A docket entry in the mortgage foreclosure case reflected the reinstatement with the notation: "foreclosure sale canceled."  The reinstatement of the stay precluded Lanigan from prosecuting, and the 2DCA from considering, Debtors' appeal of the October 24, 2013 foreclosure judgment and January 10, 2014 order denying Debtors' motion to set aside the judgment and for a new trial.  The 2DCA docket for the appeal does contain an entry showing the reinstatement.

[22] At the close of the March 3 hearing, Mr. Lampley informed the Court that Debtors' schedules needed to be amended, and that he "was still trying to get all the information to amend the schedules."  He requested "an additional ten days" to do that.  He was apparently unable to obtain the needed information from Debtors, so two days after the hearing adjourned he moved the Court for leave to withdraw.  As it turned out, Debtors' schedules were never amended.

10

16 valuation hearing to June 2, 2014, to enable the Trustee to determine whether the estate would have to pay a significant capital gains tax—due to Debtors' negligible tax basis in the Property because it had been inherited—if the Property were to be sold for a price substantially in excess of Creditor's claim.  After consulting multiple real estate brokers, the Trustee found that the Property's value was not in the $6 to $12 million range.  The relatively lower valuation was due to the Property's location, which was far from a significant highway, and the extended period of time that would be needed to sell it.  He also found that the capital gains tax consequences to the estate made a sale of the Property impracticable. He therefore engaged Creditor in negotiations over a possible tax-free disposition of the Property via a compromise settlement.

On May 29, 2014, the Trustee filed a "Motion and Notice of Compromise of Controversy" with Creditor.[23]  In light of this development, the Court cancelled the June 2 hearing and, on June 11, rescheduled the hearing for July 24, 2014.  The terms of the compromise, according to the motion, provided that Debtors would retain 160 acres of the Property as their homestead upon Creditor's release of its judgment lien on that acreage.  The Trustee would (1) agree to the Court's entry of

---

[23] Federal Rule of Bankruptcy Procedure 9019(a) provides that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement."  The Trustee's motion amended the same motion filed earlier in the day in order to omit "Debtors" from the motion's style.

an order lifting the stay so that Creditor could complete the foreclosure via a public auction, (2) give Creditor a quitclaim deed to the remaining 2,340 acres of the Property,[24] and (3) release Debtors' right to appeal the October 14, 2013 judgment of foreclosure.  Creditor would give the bankruptcy estate $300,000 for distributions to general unsecured creditors, including Creditor, whose unsecured deficiency claim of $320,000 had been allowed.

On June 23, 2014, Mr. Lanigan entered his appearance as Debtors' attorney and filed an objection to the Trustee's Motion and Notice of Compromise, contending that Creditor's $300,000 payment was "woefully inadequate in light of the property's true market value."  Three days later, the 2DCA served Mr. Lanigan with an order requiring that "[Debtors'] initial brief shall be served within 20 days or this appeal will be dismissed.  Should [Debtors] move for an extension of time, the motion must be accompanied by a status report on their obligation to pay for record preparation."[25]

At the July 24 hearing, Mr. Lanigan informed the Bankruptcy Court that if the compromise were amended to include in the 160-acre homestead a water well

---

[24] The Trustee would convey the 2,340 acres to Creditor "subject to any and all liens of record, as well as any and all easements, restrictions and reservations of record, back taxes, if any, and current and subsequent taxes."  The liens of record would include liens The Gilberti Water Company had filed to secure claims, which as of November 7, 2013, totaled $10,250,000. *See supra* note 13.

[25] Mr. Lanigan apparently had not informed the 2DCA that the Bankruptcy Court had reinstated the automatic stay, such that the appeal could not go forward.

12

located on the Property, there was an "extremely high likelihood the whole thing goes away." Debtors' objection would likely be resolved. After stating what to the Court appeared obvious, that Debtors "filed the bankruptcy . . . in order to stop [the foreclosure sale], to get the benefit of the automatic stay," the Court turned to the compromise, which it had stated "sound[ed] like a really good deal." "The Debtor ends up with 160 acres free and clear."[26] "[T]he Debtor really has to look long and hard at this deal." The Court then continued the hearing until August 28 to allow the Trustee and Creditor to consider redrawing the compromise agreement to include the well within the homestead boundaries.

On July 31, the 2DCA dismissed Debtors' appeal "for failure of appellants to comply with this court's order of June 24, 2014, requiring the filing of an initial brief." On August 25, 2014, the July 31 order became "final" and the case was "closed."

The Trustee and Debtor redrew the boundaries of Debtors' proposed 160-acre homestead to incorporate the well and, on August 27, submitted to the Court

---

[26] Joseph Gilberti attended the July 24 hearing. He informed the Court that he owned a portion of the Property. The Court noted that he acquired his portion of the Property after the foreclosure action and an accompanying lis pendens had been filed. Gilberti's lawyer, Richard A. Johnston, interjected to say that Gilberti recorded a deed to his portion of the Property prior to the entry of the foreclosure judgment. The Trustee's lawyer noted in response that Gilberti had not "even file[d] a proof of claim."

13

an "Amended Motion and Notice of Proposed Compromise" (the

"Compromise").[27]

The August 28 hearing began with the Trustee's attorney presenting the

Compromise.  The Court then asked Mr. Lanigan whether Debtors objected to the

Compromise.[28]  He said they did and announced that "we've had some recent

developments."  "I'm looking to confirm absolutely today that we have a

significant investor who . . . is entering into a contract today with Mr. Daughtrey

. . . which would ultimately be able to take out the creditor, 72 Partners, in its

---

[27] As part of the Compromise, the Trustee, who by operation of law stood in the place of Debtors in the mortgage foreclosure case, abandoned any arguments Debtors may have had for the reversal of the judgment of foreclosure or the January 10 order denying their motion to set aside the judgment and for a new trial.  To that end, the Compromise provided the following:

> **Waiver of Defenses to Foreclosure of Remaining Real Property**: The Trustee shall waive any and all defenses to the Creditor's foreclosure of the Remaining Real Property. This waiver includes the appeal previously filed by the Debtors in the Creditor's state court foreclosure action.

The initial motion to which the Compromise was attached stated:

> [T]he Trustee agrees (a) to the entry of an order by the Court granting final stay relief to the Creditor to pursue all remedies necessary in the state court action with respect to the Remaining Real Property; and (b) to waive any and all defenses to the Creditor's foreclosure of the Remaining Real Property. This waiver includes any rights in the appeal previously filed by the Debtors in the Creditor's state court foreclosure action, as such right is held by the Trustee.

In addition, the first supplemented motion for compromise stated:

> The compromise is not simply the transfer of the Real Property but consists of the waiver of the causes of action held by the estate against the Creditor, together with consent to stay relief in favor of the Creditor. [Moreover, t]he Trustee has reviewed the state court foreclosure action and does not believe there is a basis for the appeal of the Judgment.

[28] Mr. Lanigan and the attorney representing Mr. Gilberti appeared at the hearing via a prearranged conference call.

14

entirety." Lanigan had "spoken directly with all of the parties involved" and "anticipated" that the contract would be signed that day. If it was, he would be moving the Court to convert the case to a Chapter 11 proceeding. After the Court asked how long it would take "this contract to be effectuated" and informed him that its proceeds would have to cover "significant administrative costs . . . the Trustee's quantum meruit compensation and the cost and fees of the Trustee's counsel," Mr. Lanigan said that "[o]nce everybody signs, it would . . . all be done within 30 days." As for the "Trustee's quantum meruit expenses . . . and legal fees," he had a "lengthy discussion with [his] client . . . as to the unequivocal need to pay those . . . [a]nd they acknowledge that."[29] At this point, the Court turned to the Trustee for his thoughts. He expressed concern about Debtors' failure to amend their schedules, especially the Schedule F which lists creditors with unsecured claims. The Trustee had "reason to believe" on the basis of Debtors' testimony (at the 341 creditors' meetings) that "there are [undisclosed] Schedule F creditors that would be entitled to a distribution."

Council for the U.S. Trustee picked up where the Trustee left off with this statement:

> The concern, Your Honor, is the statement the Chapter 7 Trustee Rivera made that he has knowledge of undisclosed creditors that

---

[29] Mr. Lanigan had "gotten preliminary indication from [the Trustee's attorney] as to what [the Trustee's expenses and the legal fees] may be."

15

aren't on notice of this hearing much less any other hearing that has occurred in this case or any other activity in this case. And now we're learning today that Debtors' counsel may want to convert [to Chapter 11]. This seems to be a stalling tactic and a delay mechanism when the creditors that his client knows about still are not being disclosed. Mr. Lanigan [has] been in this case for more than this morning. So if he has knowledge that his client hasn't disclosed everything, that needed to be filed before today.

Mr. Lanigan, in response, acknowledged that "there may be undisclosed creditors." He closed his remarks by saying that he "would like to get this resolved without having to go into a Chapter 11. But . . . if it takes a Chapter 11 to finally resolve these issues, . . . a Chapter 11 could be successfully concluded."

After hearing from the parties, the Court concluded the hearing with this statement:

All right. Mr. Lanigan, [the Trustee] threw out a concept, which was a structured dismissal concept, which might make more sense if your clients actually have a deal. I am very concerned, the case was filed back last November. It was obviously filed in order to prevent the secured creditor from proceeding with its foreclosure remedies. . . . [W]hat I am inclined to do is roll this over one more time, and that is to the September calendar, which will be September 25th at 10:00 a.m. And, *Mr. Lanigan, you need to get on the phone with [the Trustee's lawyer and Creditor's counsel] and see what can be worked out.* And if the Debtors have a deal, the Debtors have a deal. And if that resolves everything and pays [Creditor], that's great. And if the deal is going to close in 30 days, that's wonderful.

16

(Emphasis added).[30]

The contract Mr. Lanigan "anticipate[d]" Debtors and the "significant investor" would sign on August 28—one that would provide all of the funds needed to satisfy Creditor's judgment in full and cover the Trustee's expenses and legal fees as well—did not materialize. What did materialize was Debtors' acceptance of an offer they had received two weeks earlier from two limited liability companies, Flint Family Farms, LLC, and Georgiana, LLC (the "LLCs").[31] On August 14, the companies had submitted an offer to purchase 1,449.63 acres of the Property for $3,334,148. The offer had a September 5 expiration date. Debtors accepted the offer on September 1, three days after the August 28 hearing adjourned.[32]

---

[30] As indicated *infra*, at the September 25 hearing Creditor's attorney informed the Court that he and the Trustee's lawyer had contacted Mr. Lanigan about the contract with the "investor" he described at the August 28 hearing, but they "heard nothing" from him in response.

[31] Flint Family Farms, LLC was a Florida limited liability company formed January 21, 2011 to pursue "any and all lawful business**."** Robert Jerome Flint, Jr. was the only initial member and is listed as the Manager-Member for every year of the LLC's existence. He signed the October 14, 2014 Agreement with Debtors. Flint Family Farms, LLC was administratively dissolved for failure to file an annual report on September 23, 2016, and remains inactive.

Georgiana, LLC is a North Carolina manager-managed limited liability company formed December 14, 2010. Its initial members were James P. Burch—who signed the October 14, 2014 Agreement with Debtors, and who is also listed as the registered agent and manager—and William E. Burch, both North Carolina residents. Georgiana, LLC's purpose was listed as "Farm" from its inception through March 9, 2016, when the purpose was changed to "Land Investment." Georgiana, LLC is still listed as active.

[32] The companies' obligation to go forward with the purchase was "contingent on financing acceptable to purchaser" and Debtors' production of an insurable title to the property "subject only to easements, zoning and restrictions of record and free and clear of all other

17

The record is silent on the point, but it is fair to assume that when Mr. Lanigan appeared before the Court on August 28, he was unaware of the companies' offer, and Debtors' intent to accept it. He became aware of it later, however, on September 15, when (according to Debtors' next attorney, Paul DeCailly) Debtors instructed him to offer Creditor $3,334,000 in satisfaction of its judgment. He did not make the offer. Nor did he get on the phone with the Trustee's and Creditor's lawyers to see what could be worked out, as the Court had instructed. Instead, he moved the Court for leave to withdraw as Debtors' counsel on September 22. The same day, Paul DeCailly replaced him as Debtors' attorney[33] and pursuant to 11 U.S.C. § 706(a) filed a "Motion to Convert to a Case Under Chapter 11" (the "Motion to Convert"). The motion stated that "the Debtors now realize that they filed under the wrong chapter, and due to the Debt limits imposed under Chapter 13, the Debtors [sic] only option [is] for reorganization." The motion was perfunctory. It contained no reference to the contract Mr. Lanigan expected Mr. Daughtrey to enter into with a "significant investor" on August 28. Nor did it refer to any proposal that might constitute a feasible plan of

---

encumbrances except as stated in this offer." The contract provided that "Purchaser shall be given possession . . . on October 17, 2014." The transaction would close thirty days after "Purchaser's receipt of an abstract showing marketable title in Seller or title insurance binder showing insurable title in Seller."

[33] At the September 25 hearing, the Court noted on the record that Mr. DeCailly had "sat in" on the August 28 hearing as an observer.

18

reorganization.  The motion merely stated that the Debtors had an "absolute right"
to the conversion to Chapter 11, and that a conversion "can bring about more value
to the estate and pay a dividend to *unsecured creditors* in a more beneficial manner
than the Chapter 7 trustee, and further, can accomplish this in a manner more
economical than in a [C]hapter 7."[34]  (Emphasis added).  Joseph Gilberti,
represented by Andrew Tapp, also filed a § 706(a) motion to convert the case to
Chapter 11.[35]

The September 25 hearing began with a colloquy between the Court and
Carmen Dellutri of The Dellutri Law Group.[36]  The U.S. Trustee had subpoenaed
the firm (which, through David Lampley, had represented Debtors prior to March
5, 2014) for documents that might identity the unsecured creditors Debtors had
failed to list in their Schedule F filing, which they had not amended.  During the
colloquy discussion, Mr. DeCailly intervened and announced that he intended to
file amended schedules on behalf of Debtors: "amended schedules D, . . . F, E if

---

[34] The Motion to Convert referred to "unsecured creditors."  Debtors' initial Schedule F listed no unsecured creditors and an amended Schedule F had not been filed.

[35] Mr. Tapp replaced Richard A. Johnston as Mr. Gilberti's attorney.  The motion he filed was on behalf of Mr. Gilberti and Land Tech Design Group, Inc.

[36] When the hearing began, Mr. Lanigan was on the telephone listening in.  He was there on the phone because the Court had instructed him at the August 28 hearing to get with the lawyers for the Trustee and Creditor to see what could be worked out.  The Court had continued the hearing to September 25 to enable him to do that.  The Court implied that if they could not come to terms, it would approve the Compromise.  As it turned out, Mr. Lanigan and the lawyers never got together, and the scheme Mr. Lanigan posited at the August 28 hearing passed by the boards.

19

necessary." The Court went one step further and ordered him to "file [the] amended schedules within 14 days" of a hearing scheduled for October 23.[37]

After that, Mr. DeCailly informed the Court that he and the Trustee had discussed the possibility of a "structured dismissal" of the case. He concluded, however, that a structured dismissal was not feasible. Therefore, Debtors would pursue the motion he had filed on September 22 to convert the case to a Chapter 11 proceeding. The Court asked: "The Debtors are going to convert to an 11 and then what?" Mr. DeCailly's answer:

> [W]e do have a buyer—and from my perspective, I don't quite yet know what we're selling. . . . The current buyers, they're getting a survey now. They're spending the money to survey the property so we know exactly what's being sold and what's being kept. But the— this case can go forward in an 11. I understand it's been going on for almost a year. But in the statute, of course, there is no time limit. It just says that we can motion to convert [sic] at any time.[38]

After hearing from Mr. DeCailly, the Court turned to the Trustee's lawyer. She reminded the Court that under the Supreme Court's decision in *Marrama v. Citizens Bank*, 549 U.S. 365, 127 S. Ct. 1105 (2007), a debtor does not have an absolute right to convert a Chapter 7 case to one under Chapter 11. The right to

---

[37] On October 23, the Court would hear The Dellutri Law Group's motion to quash the U.S. Trustee's subpoena.

[38] Later in the hearing, Mr. DeCailly again stated the parties did not know exactly what was being sold: "Your Honor, I've spoken at length with the Debtor. I've also spoken at length with the prospective buyer who is willing to pay. But again, we still don't know exactly what he's paying for. It's a large parcel of land. Nobody has an exact description. It's being done by the buyer."

convert is subject to a "good faith" requirement. She implied that Debtors were not proceeding in "good faith." Moreover, if the case were converted to Chapter 11, it would wind up back in Chapter 7 due to Debtors' inability to present a feasible plan of reorganization. The lack of good faith and the likelihood that the case would ultimately be disposed of under Chapter 7 militated against conversion: "conversion [was not] in the best interest of the estate."

Creditor's counsel spoke next. After observing that Debtors had been represented by seven lawyers in the foreclosure action and were on their third lawyer in the bankruptcy case, counsel contended that Debtors' attempt to convert the case to one under Chapter 11 was not in good faith; rather, the attempt was "nothing more than abuse of the [bankruptcy] process." He summarized the lack of good faith.

> At the last hearing Your Honor heard that there was a buyer that was imminent. Myself [and Trustee's lawyer], we both contacted Mr. Lanigan: Where's our payoff request? We're ready to make this happen for you. We've heard nothing, Your Honor. And similar to the last several hearings, there is a flurry of activity that occurs the week of the hearing before Your Honor. And, Your Honor, the concern I have at this point is that the if Court grants this conversion, we're going to be right back in front of you in a month, another two months, three months, but ultimately we're going to end up right back here with this compromise because that's the only viable offer on the table at this point to resolve this case.

21

After the Court announced that the Compromise was "the proposal that's on the table" and Creditor's attorney reiterated that "a judge has already ruled in the state court action that we're entitled to final judgment of foreclosure on the whole parcel," the Court asked Mr. DeCailly if he had "anything else" to say. He did. He explained what he meant when he stated earlier in the hearing that "[w]e do have a buyer."

> Your Honor, . . . there is a buyer out there who I've spoken with who is willing to pay up to $3 million for [1,400 acres of] the property. But he's not—they're not right now in the position to sell it, and he's not in the position right now—he's not willing to turn over the funds in escrow until we determine where this case is going. I haven't had a chance to contact opposing counsel yet regarding that 3 million. I also would like to get the full picture of who's involved in this case. I agree, the schedules need to be looked at and they need to be redone. The Court had concern about filing proofs of claim. Well, as we know, if you convert it to an 11, we get a new proof of claim period. All the periods start over again. We can go forward knowing exactly—and it may end up in the same structured dismissal later on that you've described, then we'll know everybody involved and we will have had an opportunity to propose this sale and get the lienholder together with the buyer.[39]

---

[39]Mr. DeCailly never indicated the amount of acreage for which the buyer was "willing to pay up $3 million"; nor did he identify the buyer, referring intermittently to the buyer as "he" and "they." Mr. Tapp was the one who cleared the air and indicated the number of acres involved: "The deal with the $3 million we're talking about, not the Trustee's deal, doesn't sell the full 2500 acres. It sells 1400 acres."

It is reasonable to infer that Mr. Tapp was talking about Debtors' acceptance on September 1 of the offer the limited liability companies made on August 14 to purchase 1,449.63 acres of the Property for $3,334.148, and that Mr. DeCailly was well aware of the offer and acceptance. But, Mr. DeCailly decided to withhold that information from the Court. Instead, he referred to a buyer's offer of "up to $3 million" for the purchase of an amount of acreage yet to be determined. Disclosing the limited liability companies' offer and Debtors' acceptance would have materially contradicted Mr. Lanigan's representation to the Court on August 28—that he

22

Mr. DeCailly was representing that Debtors' Chapter 11 reorganization plan would provide $3 million. He did not explain how $3 million would be sufficient to satisfy Creditor's judgment of $4,267,436, which was drawing interest at the rate of 4.75% per annum, much less pay the fees of the Trustee and his attorney, other administrative expenses, the capital gains tax the sale of the land would generate, and the unsecured creditors yet to be identified in an amended Schedule F which he had been ordered to file.

Having heard from counsel, the Court announced its rulings on Debtors' and Gilberti's Motions to Convert and on the Compromise. The Court said that when it first reviewed the Compromise, "it appeared to be a win-win for everyone because the Debtors were on the verge of losing the [entire] property to foreclosure. They were able to discharge their obligation to 72 Partners, they were able to retain a 160-acre homestead property. That seemed like a great deal." Continuing, the Court observed:

> So here we are months after the original compromise was filed. There's really been no progress made that I can see. There's still a party that's out there waiting in the wings; may be interested in purchasing the property, but there's no offer before this Court. I've

expected Debtors to enter into a contract that day which would provide funds sufficient to satisfy Creditor's judgment and the expenses incurred in administering the bankruptcy estate, funds far in excess of $3,334,148. The buyer to which Mr. DeCailly referred was not the limited liability companies. He was referring to a buyer who had recently come on the scene and with whom no agreement had been reached. In fact, Debtors were "not right now in the position to sell."

23

been hearing about this party since the initial hearing, I think it was back at the July hearing.  There are evidently other creditors out there that would share in a distribution to unsecured creditors.  And for those reasons, at this time I can't find that the case should be . . . converted to a Chapter 11 case. . . . [T]he *Marrama* case does control.

And when the Debtors have elected to file a Chapter 7 case and now when they're on the eve of losing the property through a sale by the Chapter 7 Trustee, they now seek to convert late in the day, seek to convert the case to a Chapter 11. They're not here with a purchase contract.  They're not here with something where they can tell the Court, tell the Trustee, tell [Creditors' counsel], that there is an offer right here on the table today, ready to be closed within 30 days, which is what I believe we talked about at the last hearing. . . . [W]e're now hearing the Debtors should be entitled . . . to convert the case to a Chapter 11 case to propose a Plan.  That's a lengthy process. They've had the protection of the automatic stay now for 11 months.  They've had plenty of time to figure out what it is they want to do with this property.  They've been represented by [different] counsel on at least two prior occasions. And for all those reasons, I think it's appropriate to deny the motion to convert the case to a Chapter 11 and to grant the [Trustee's] amended motion to compromise with the carveout for the Debtors of the well and the . . . 160-acre homestead property.

On October 3, 2014, the Bankruptcy Court entered orders denying Debtors' and Gilberti's Motions to Convert for "the reasons stated orally in open court" on September 25.  Four days later, the Court entered an order approving the Compromise "for the reasons stated orally in open court" on September 25.  The Trustee and Creditor thereafter consummated the Compromise in part.  The Trustee executed, and Creditor recorded with the Clerk of the Sarasota County Circuit Court, a quitclaim deed which carved out of the 2,500 acres of the Property a 160-acre homestead, including the well, and Creditor gave the Trustee

24

$300,000.[40]  What remained to be done was the Court's entry of an order lifting the stay to enable Creditor to move the Sarasota County Circuit Court to set a date for the public auction and the sale of 2,340 acres of the property.

B.

On October 17, 2014, Debtors, through Mr. DeCailly, moved the Court for "reconsideration" of its order denying their September 22 Motion to Convert.  The motion asserted that the Motion to Convert had been filed in good faith, contrary to the position the Trustee and Creditor had taken at the September 25 hearing.  The Trustee and Creditor had argued that the filing was not in good faith, and instead constituted an abuse of the bankruptcy process.

Although styled a "Motion for Reconsideration," the motion was an entirely new Motion to Convert, for it was based on facts that had not been disclosed either before or after the September 22 Motion to Convert was filed.  Instead, the motion for reconsideration was based on the following facts and two documents Debtors were providing to the Court for the first time.  Namely, that

> the Debtors had arranged for an offer to the secured creditor a purchase agreement for the property for $3,334,000.00 and had forwarded it to their attorney [Lanigan] on September 15, 2014. . . .

---

[40] The Trustee also waived any causes of action the bankruptcy estate had against Creditor, and relinquished Debtors' right to appeal the foreclosure judgment.  *See supra* note 27.

25

Their attorney never acted on the request to present the offer to counsel for 72 partners as instructed. On . . . September 21, 2014 the Debtor[s] terminated the attorney client relationship between prior counsel and them, and retained the services of undersigned [Mr. DeCailly]. The parties met and discussed the best way to proceed, and it was determined that a motion to convert the case should be filed. Counsel drafted and filed a motion.[41]

The two documents, which were attached to the motion, purported to be separate agreements to purchase portions of the Property. The first document, entitled "Agreement to Purchase Real Estate," was in the form of an offer extended to Debtors on August 14, 2014 by "Georgiana, LLC" and "Flint Family Farms, LLC," to purchase 1,449.63 acres of the Property for $3,334,148.[42] The offer was "contingent on financing acceptable to purchaser[s]." If acceptable financing was available, the purchase would close "30 days after Purchaser[s]' receipt of an abstract showing marketable title in Sellers or title insurance binder showing insurable title in Seller[s]." In any event, "Purchaser[s] shall be given possession of the property on October 17, 2014." Debtors accepted the offer on September 1, 2014. It is obvious that the Agreement to Purchase Real Estate was the document

---

[41] Mr. DeCailly was saying that Debtors instructed Mr. Lanigan to offer Creditor $3,334,000 in full satisfaction of Creditor's judgment of $4,267,436 (plus interest). Apparently, the payment would be funded by the sale of 1,400 acres to the "buyer" Mr. DeCailly referred to at the September 25 hearing. Creditor presumably would release its judgment lien on the remaining 1,100 acres of the Property, which Debtors would retain. Mr. Lanigan did not tender this offer to Creditor's counsel.

[42] Debtors' 160-acre homestead was outside the 1,449.63 acres.

Debtors forwarded to Mr. Lanigan on September 15, 2014, and what Mr. DeCailly was referring to at the September 25 hearing when he said that he had spoken to a buyer "who is willing to pay up to $3 million for [1,400 acres of] the property."

The second document, entitled "Agreement," was entered into on October 14, 2014. The LLCs agreed to purchase the Property (except for the 160-acre homestead) for $4,621,000. The closing was to be held "fifteen days after the entry of the sale order [by the Bankruptcy Court]," and was subject to several other conditions precedent.[43]

On October 21, four days after Mr. DeCailly moved the Court to reconsider its order denying Debtors' Motion to Convert, Mr. Gilberti moved the Court to reconsider its order approving the Compromise.[44]

The Bankruptcy Court heard Debtors' and Mr. Gilberti's motions on November 5, 2014. Before it considered the motions, however, the Court questioned Mr. DeCailly about Debtors' failure to amend their Schedules, especially Schedule F, listing the unsecured creditors. He said that twenty-seven

---

[43] Mr. DeCailly's motion for reconsideration did not explain why the Court should reconsider its October 3 denial of Debtors' September 22 Motion to Convert based on the September 1 Agreement, the existence of which he had withheld from the Court at the September 25 hearing, and the October 14 Agreement. Neither constituted newly discovered evidence that might support a motion for reconsideration.

[44] Mr. Gilberti filed the motion on behalf of himself and LandTech Design Group, Inc.

creditors needed to be listed, some of whom "were closed." He indicated that an amendment would be forthcoming.

With the unsecured creditor issue out of the way, the Court turned to the Debtors' October 14 Agreement with the LLCs with this comment: "If they have a buyer ready, willing and able to close on the property for $4.621 million, then tell us what the closing date is and work it out." Mr. DeCailly's reply: "I believe we can close within 15 days." With that, the Court turned to the Trustee's lawyer.

The Trustee's lawyer pointed out that in addition to the above payments, given Debtors' very low basis in the Property (most of which had been inherited), a significant capital gains tax would have to be paid. To pay the tax, the Property (less the 160-acre homestead) would have to be sold for $6 to $7 million. It was because a sale at that price was out of the question that the Trustee "entered into this agreement . . . with 72 Partners, because it carved out what was so important to the Debtors . . . their acreage and the well."

The Court asked Mr. DeCailly whether there were "tax consequences to the Debtors." His response: "Yes. And I asked [Mr. Daughtrey to] try to figure out his basis. . . . That's a daunting thing for him right now . . . to figure that out." But, he continued, "[w]e can work around the tax issues." He then revealed what was actually behind the motion for reconsideration—to convert the case to a Chapter 11 and sell the Property (less 160 acres) for $4,621,000.

28

The point is these are farmers. This land has been in their family for a long time. And if it must—if it cannot—absolutely cannot stay . . . in their family, then they want to see it stay with the neighbor who's been there generation after generation so it can be used for what it's used for, farming.

The Court's response was that if it did not approve the Compromise, Debtors would be faced with

[t]he foreclosure of the property, so they would have had nothing. They wouldn't have had their homestead. They wouldn't have had their well. That's why . . . this resolution seemed to be a win-win for everybody, because the Daughtreys get to keep their [160] acres, they get to keep their well, 72 Partners is paid and gone.

The Court next heard from Creditor's attorney. He reminded the Court that the Compromise had been "consummated," and that in recording the Trustee's deed, Creditor had expended "thirty or forty thousand dollars [on] documentary stamp taxes." In addition, having learned that Debtors had been "receiving payments from sod companies . . . stripping the property of sod" and that "[t]here [were] multiple hunting leases that the Daughtreys had been receiving money for," Creditor had taken steps to "secure[] the property." Creditor's attorney also reminded the Court that over the previous eighteen to twenty-four months, "Gilberti ha[d] placed . . . about $70 million in claims liens against the property [and] had the Daughtreys execute various deeds to him." Some were recorded after the lis pendens was recorded in connection with the mortgage foreclosure action; others were filed post-petition. Mr. DeCailly acknowledged the existence

29

of Gilberti's post-petition liens and that if the case were converted to Chapter 11, proceedings would need to be initiated to nullify the deeds and the liens "[b]ecause no title company is going to back this sale, if it's a sale."

After hearing from Gilberti's attorney, who confirmed that Gilberti had not filed a proof of claim in the case, and instructing the Trustee's attorney to ensure that Debtors filed an amended Schedule F, the Court adjourned the hearing.

On November 18, 2014, the Court denied Debtors' October 17 motion for reconsideration of its October 3 order denying Debtors' Motion to Convert and Mr. Gilberti's October 21 motion for reconsideration of its October 7 order approving the Compromise. The Court also entered an order granting Creditor's motion for relief from the automatic stay.

## C.

Debtors, still represented by Mr. DeCailly, appealed the Bankruptcy Court's decisions to the District Court on December 8, 2014. DeCailly filed two notices of appeal. One challenged the Bankruptcy Court's order of October 3, denying Debtors' Motion to Convert, and its order of November 18, denying their motion for reconsideration of that order. The other notice challenged the Court's October 7 order granting the Trustee's amended motion to approve the Compromise. The District Court consolidated the appeals.

The District Court affirmed the Bankruptcy Court's orders of October 3, October 7, and November 18, 2014, finding no abuse of discretion in the Court's decisions. On the conversion issue, the District Court concluded that the Bankruptcy Court, following *Marrama*'s teaching, properly found that Debtors failed to present a feasible plan of reorganization. The District Court reasoned that Debtors provided no time frame for filing and consummating a Chapter 11 Plan. Assuming the proposed October 14, 2014 Agreement between Debtors and the LLCs[45] became the Plan, Debtors would incur a capital gains tax in an amount the sale proceeds could not cover. The Chapter 11 proceeding would fail and the case would be converted to Chapter 7. At that point, Creditor would obtain relief from the automatic stay, the public auction would go forward, and the Property, including the 160 acres Debtors hoped to retain as a homestead, would be sold. The approval of the Compromise eliminated the problems conversion to Chapter 11 would create. Further, it placed Debtors in a better position than they would have occupied had their agreement with the LLCs gone forward.

Debtors disagree with the District Court's analysis and therefore appeal its judgment.

---

[45] The October 14, 2014 Agreement was a "proposed" agreement because Debtors' interest in the Property was part of the Chapter 7 estate and thus in the Trustee's exclusive control. Similarly proposed for the same reason was Debtors' September 1, 2014 acceptance of the LLCs' offer to purchase part of the Property.

31

II.

"In the bankruptcy context, this court sits as a second court of review and thus examines independently the factual and legal determinations of the bankruptcy court and employs the same standards of review as the district court." *In re Optical Techs., Inc.*, 425 F.3d 1294, 1299–1300 (11th Cir. 2005) (quotation omitted).  We review the legal conclusions of either the bankruptcy court or the district court *de novo*, and the bankruptcy court's factual findings for clear error. *Id.*  A factual finding is not clearly erroneous unless, after reviewing all of the evidence, we are left with "a definite and firm conviction that a mistake has been committed."  *Lykes Bros., Inc. v. U.S. Army Corps of Eng'rs*, 64 F.3d 630, 634 (11th Cir. 1995) (citing *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395, 68 S. Ct. 525, 542 (1948)).

A bankruptcy court's approval of a compromise or settlement is reviewed for abuse of discretion.  *Christo v. Padgett*, 223 F.3d 1324, 1335 (11th Cir. 2000).  The standard of review applied specifically to a bankruptcy court's denial of a motion to convert, on the other hand, appears to be a question of first impression in this Circuit.  The Trustee contends that the proper standard is abuse of discretion.[46]

---

[46] But we also note that, in its initial appeal to the District Court, the Trustee put it thusly: "This Court reviews the bankruptcy court's legal conclusions de novo and its factual findings for clear error. *Both standards apply to review of the Conversion Denial Order*."  (Emphasis added).

Debtors argue we should review the ruling *de novo*.  The District Court reviewed it

for abuse of discretion.[47]

The weight of authority leans manifestly towards abuse of discretion.[48]  The

essential point is that whether to convert a Chapter 7 case to one under Chapter 11

is within the "sound discretion of the court" and depends upon whether conversion

would "inure to the benefit of all parties in interest."  *In re Gordon*, 465 B.R. 683,

692 (Bankr. N.D. Ga. 2012) (internal quotation marks omitted) (quoting S. Rep.

---

[47] The District Court reasoned that "[w]here a matter is committed to the discretion of the bankruptcy court, the district court must affirm unless it finds that the bankruptcy court abused its discretion."  Thus, because "[t]he decision whether to convert is left in the sound discretion of the court, based on what will most inure to the benefit of all parties in interest," *In re Gordon*, 465 B.R. 683, 692 (Bankr. N.D. Ga. 2012) (internal quotation marks omitted) (quoting S. Rep. No. 95–989, at 940 (1978)), abuse of discretion is the appropriate standard of review for a Bankruptcy court's denial of a motion to convert.

[48] *See, e.g.*, *In re Jacobsen*, 609 F.3d 647, 652 (5th Cir. 2010) ("The decision to convert a Chapter 13 case to Chapter 7 under § 1307(c) ['for cause'] is reviewed for abuse of discretion."); *In re Rosson*, 545 F.3d 764, 771 (9th Cir. 2008) ("We review for abuse of discretion the bankruptcy court's ultimate decisions to deny a request for dismissal of a Chapter 13 case under § 1307(b) and to convert a case from Chapter 13 to Chapter 7."); *In re Myers*, 491 F.3d 120, 125 (3d Cir. 2007) ("We review the Bankruptcy Court's decision to dismiss the bankruptcy case as a bad faith filing for abuse of discretion."); *In re Consolidated Pioneer Mortg.*, 264 F.3d 803, 806–07 (9th Cir. 2001) ("The decision to convert the case to Chapter 7 is within the bankruptcy court's discretion. Such a decision 'will be reversed only if based on an erroneous conclusion of law or when the record contains no evidence on which [the bankruptcy court] rationally could have based that decision.'"); *Matter of McDonald*, 118 F.3d 568, 570 (7th Cir. 1997) (reviewing bankruptcy court's dismissal of Chapter 13 case for failure to make timely payments under the plan for abuse of discretion); *In re Schlehuber*, 489 B.R. 570, 573 (B.A.P. 8th Cir. 2013), *aff'd*, 558 F. App'x 715 (8th Cir. 2014) ("We review the conversion of a Chapter 7 case to Chapter 11 under Bankruptcy Code § 706(b) for an abuse of discretion.").

Indeed, our review of precedent yielded only one seemingly contrary authority.  The Court in *In re John Franklin Copper* reviewed the denial of conversion from Chapter 7 to Chapter 13 *de novo*.  314 B.R. 628, 630 (B.A.P. 6th Cir. 2004).  But a closer look reveals that the Sixth Circuit took care to note that the facts there presented "an issue of statutory construction" that had to be reviewed *de novo.  In re John Franklin Cooper*, 426 F.3d 810, 812–13 (6th Cir. 2005).

No. 95–989, at 940 (1978)).  And where a matter is committed to the discretion of the bankruptcy court, the reviewing court must affirm unless it finds that the bankruptcy court abused its discretion.  *Amlong & Amlong, P.A. v. Denny's, Inc.*, 500 F.3d 1230, 1238 (11th Cir. 2006).

A bankruptcy court abuses its discretion when it either misapplies the law or bases its decision on factual findings that are clearly erroneous.  *In re Mandalay Shores Co-op. Housing Ass'n, Inc.*, 21 F.3d 380, 383 (11th Cir. 1994).  In conducting abuse of discretion review, we "recognize the existence of a range of possible conclusions" the trial court may reach and "must affirm unless we find that the court has made a clear error of judgment, or applied the wrong legal standard."  *In re Kingsley*, 518 F.3d 874, 877 (11th Cir. 2008) (internal quotation marks and citation omitted) (alteration accepted).

With these principles in hand, we consider Debtors' appeal.  We begin with their challenge to the denial of their Motion to Convert.  From there, we move to the denial of their motion for reconsideration and then to the approval of the Compromise.

### III.

### A.

Although Debtors appealed the Bankruptcy Court's orders of October 3, 2014, denying their Motion to Convert, and November 18, 2014, denying their

motion for reconsideration, in their opening brief they lump the challenges together.  In his answer brief, the Trustee does the same.  We treat the appeals separately.

Debtors argue that they had an "absolute right" under 11 U.S.C. § 706(a) to convert their Chapter 7 case to Chapter 11.  Anticipating the Trustee's argument that their Motion to Convert was properly denied because they had filed it in "bad faith," Debtors submit that the Trustee failed to make a "prima facie showing of bad faith."  "The Court did not deny [their Motion to Convert] because they committed fraud, or waste, or concealed anything.  The Court denied the motion because the case was 11 months old."[49]  Absent the Trustee's prima facie showing of bad faith, they argue that the Court, in a proper exercise of discretion, should have granted their Motion to Convert.

In his answer brief, the Trustee disagrees with Debtors' right-to-convert argument for three reasons.  First, the Trustee takes issue with the notion that a debtor has an "absolute right" under § 706(a) to convert a Chapter 7 case to Chapter 11.  He points out that the right is limited by subsection (d), which

---

[49] The District Court rejected Debtors' argument that the Bankruptcy Court denied conversion "because the case was 'too old to convert.'"  We agree with the District Court.  There is nothing in the record to support the argument that the Bankruptcy Court denied conversion because the case was eleven months old.  The Court referred to the age of the case on several occasions, but did so only to stress that the case, which should never have been filed under Chapter 7 in the first place, needed to be resolved.  Mr. DeCailly admits as much.  Debtors, acting on "bad legal advice," should have brought their case under Chapter 11, not Chapter 7.

35

provides that "a case may not be converted" from Chapter 7 to Chapter 11 "unless the debtor may be a debtor" under Chapter 11. *See* 11 U.S.C. § 706(d). Debtors could not qualify as Chapter 11 debtors, he contends, because they had "no likely prospect of reorganization," *see* 11 U.S.C. § 1112(b)(4)(A), and conversion to Chapter 11 was therefore precluded under *Marrama*.

Second, the Trustee argues that Debtors' eleventh-hour Motion to Convert the case evidenced an absence of good faith. Debtors' sole purpose in seeking conversion was to thwart the approval of the Compromise. Mr. DeCailly admitted as much at the November 5, 2014 hearing. Debtors wanted the LLCs, not Creditor, to receive the Property.

Third, the Trustee avers, denying conversion would not adversely affect Debtors. They would retain a 160-acre homestead under the Compromise. Debtors would be adversely affected, though, if the Compromise was not approved, the case was converted to Chapter 11, and their plan failed confirmation. The case would either be dismissed or converted back to a Chapter 7, the result being that the Property would be sold at public auction, leaving Debtors with nothing.

### B.

The Bankruptcy Code provides that a debtor "may convert" a Chapter 7 case to a case under Chapter 11 "at any time." 11 U.S.C. § 706(a). This right is limited

36

by subsection (d), which provides that "a case may not be converted" from Chapter 7 to Chapter 11 "unless the debtor may be a debtor" under Chapter 11. *Id.* § 706(d). In other words, a debtor's right to convert is "expressly conditioned" on his ability to qualify as a debtor under the Chapter to which he seeks to convert. *Marrama*, 549 U.S. at 372, 127 S. Ct. at 1110.[50]

A court "*shall* convert" a case under Chapter 11 to Chapter 7 "or dismiss [it], whichever is in the best interests of creditors and the estate, *for cause*." 11 U.S.C. § 1112(b)(1) (emphasis added). A *non-exhaustive* list of "causes" includes, among other things, "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation," a debtor's "gross mismanagement of the estate," or a debtor's "inability to effectuate substantial consummation of a confirmed plan." *Id.* § 1112(b)(4)(A), (M), (B).

To rule that one's Chapter 11 case "should be dismissed or converted to Chapter 7 . . . is tantamount to a ruling that the individual does not qualify as a debtor under" Chapter 11. *See Marrama*, 549 U.S. at 365, 373–74, 127 S. Ct. at

---

[50] In *Marrama*, the Supreme Court held that a court may deny a debtor's request to convert a case from Chapter 7 to Chapter 13 where "cause" exists under 11 U.S.C. § 1307(c) to dismiss the case or convert it back to Chapter 7. 549 U.S. at 373, 127 S. Ct. at 1110–11. Chapter 11 contains a provision nearly identical to § 1307(c), except that while Chapter 13 provides that a "court *may*" convert or dismiss a case "for cause," Chapter 11 mandates that "the court *shall*" convert or dismiss such a case. 11 U.S.C. §§ 1123(b)(1), 1307(c) (emphasis added). The Supreme Court's reasoning thus applies with even more force here. Moreover, the Court couched its ruling in language and logic consonantly suitable to conversions to Chapter 11. Therefore, *Marrama*'s holding applies equally to conversions from Chapter 7 to Chapter 11.

1110–11. Thus, § 706(d) "provides adequate authority" to deny a motion to convert to Chapter 11 when "cause" exists under § 1112(b)(4). *Id.* at 374, 127 S. Ct. at 1111. If, as Debtors argue, conversion to Chapter 11 must occur before § 1112(b)(1) comes into play, it means that the bankruptcy court must go through the formality of granting conversion and then, in the next breath, dismiss the case or convert it to a Chapter 7. This would place form over substance and defy common sense.[51]

The Trustee contends that the Bankruptcy Court properly denied Debtors' request to convert to Chapter 11 because "cause" existed to either dismiss the case or convert it back to a Chapter 7, based on "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation." 11 U.S.C. § 1112(b)(4)(A).

We agree. Moreover, as we review below what transpired in this case after the Trustee filed his "Motion and Notice of Compromise" on May 29, 2014, it becomes apparent that other § 1112(b)(4) causes for denying conversion to Chapter 11 were present as well: "failure to comply with an order of the court," "failure

---

[51] Moreover, in adopting Debtors' position, we would "fail[] to give full effect to the express limitation in" § 706(d). *See Marrama*, 549 U.S. at 372, 127 S. Ct. at 1110; *Corley v. United States*, 556 U.S. 303, 314, 129 S. Ct. 1558, 1566 (2009) (noting that it is "one of the most basic" canons of statutory interpretation that "a statute should be construed so that effect is given to all its provisions") (internal quotation marks and citations omitted); *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 386, 133 S. Ct. 1166, 1178 (2013) ("[T]he canon against surplusage is strongest when an interpretation would render superfluous another part of the same statutory scheme.").

timely to provide information or attend meetings reasonably requested by the United States trustee," and "inability to effectuate substantial consummation of a confirmed plan." *Id.* § 1112(b)(4)(E),(H), (M). Also present was a cause not listed in the statute, the lack of good faith. "[A] debtor's lack of 'good faith' may constitute cause for dismissal of a petition." *In re Nat. Land Corp.*, 825 F.2d 296, 297 (11th Cir. 1987) (internal quotation marks omitted). In sum, a bankruptcy court does not abuse its discretion in denying conversion from Chapter 7 to Chapter 11 where "cause" exists that would require the Court to dismiss or reconvert the Chapter 11 case anyway. Multiple bases for "cause" exist here.

## C.

The bare facts of what transpired make that pellucidly clear. The Trustee negotiated the first draft of the Compromise with Creditor after consulting several real estate brokers and concluding that due mainly to its location and the time it would take to sell it, the Property's value was not in the $6 to $12 million range discussed at the February 20 meeting of creditors. Moreover, if sold, a significant capital gains tax would be imposed.[52]

---

[52] Any tax "incurred by the estate" is categorized as an administrative expense under 11 U.S.C. § 503(b)(1)(B)(i), entitled to second priority under 11 U.S.C. § 507(a)(2). *See* Richard Levin & Henry J. Sommer, 4 *Collier on Bankrputcy* ¶ 503.07 (16th ed. 2018) ("[F]or a tax claim to be entitled to administrative expense priority, a court must determine that (1) the tax was 'incurred' by the estate; and (2) the tax claim is not a claim which must be treated as a prepetition priority claim under § 507(a)(8)."). Administrative expenses have priority over all

39

On June 11, the Court scheduled a hearing for July 24 on the Trustee's Motion and Notice of Compromise.  On June 23, Mr. Lanigan appeared as Debtors' attorney and filed an objection to the proposed Compromise.  By July 24, however, they were having second thoughts.  As Mr. Lanigan expressed it at the hearing, if the boundaries of the 160-acre homestead tract were redrawn to include the well, there would be an "extremely high likelihood that the whole thing goes away."  It is easy to understand why Debtors had a change of mind.  The chances of the 2DCA vacating the foreclosure judgment were nonexistent, meaning that Creditor's lien was valid and covered all 2,500 acres of the Property.  And there were no investors on the horizon ready to step in with a solution better than the one the Compromise provided.  The Court told Mr. Lanigan that his clients "really ha[d] to look long and hard at this deal."  It continued the hearing to August 28 to give Debtors space to take that hard look and the Trustee and Creditor time to redraw the boundaries of the 160-acre tract to accommodate the well.

The Trustee and Creditor solved the problem, placing the well within the 160-acre tract, and submitted a final version of the Compromise to the Bankruptcy Court on August 27.  Meanwhile, Debtors had a change of heart.  Two investors

---

other expenses and claims except for domestic support obligations, which are not at issue here. *See* 11 U.S.C. § 507(a)(1)–(2).

40

had appeared, the LLCs, and expressed an interest in purchasing part of the Property.  On August 14, in a document headed "Agreement to Purchase Real Estate," they submitted an offer to purchase 1,449 acres for $3,334,149.  Debtors had until September 5 to accept it.  They would do so, on September 1 (the "September 1 Agreement").  Debtors had convinced themselves that Creditor would be willing to take $3,334,149 in full satisfaction of its judgment.  They must have been informed that for this to happen, their Chapter 7 case would have to be converted to one under Chapter 11.  As for now, going along with the Compromise proposal was out of the question.  Debtors would resist its approval at every turn.

Debtors informed Mr. Lanigan of their position on the eve of the August 28 hearing.  But they apparently did not tell him about the offer the LLCs had made and that they were going to accept it on September 1.  Instead, they told him something else:  they had located an investor willing to provide them with the funds necessary to satisfy Creditor's judgment in full and pay the costs of the bankruptcy proceeding as well.

Mr. Lanigan acted on this information the moment the August 28 hearing began.  He told the Court that "a significant investor . . . is entering into a contract today with Mr. Daughtrey"; he had "spoken directly with all the parties involved." They represented that the contract would provide all of the funds needed satisfy Creditor's judgment "in its entirety."  The Court informed him that in addition to

41

paying Creditor in full, the funds would need to cover "significant administrative costs . . . which are the Trustee's quantum meruit compensation and the cost and fees of the Trustee's counsel." Mr. Lanigan said that he had gotten from the Trustee's counsel a "preliminary indication as to what those may be" and then "had a very lengthy discussion with [Debtors] and a very direct discussion as to the unequivocal need to pay those, . . . and they acknowledge that. And within the parameters of what's being done, the funds will be there to do that."

The U.S. Trustee's counsel objected to Mr. Lanigan's plan to convert the case under Chapter 11, arguing that the conversion would be yet another "stalling tactic and a delay mechanism." The Trustee echoed his sentiments. Debtors had been stalling from the start, he said. They "failed to appear for three" of the first four § 341 meetings of creditors and refused to file "amended schedules B, E and F" despite repeated requests for amendments.

The Court accepted Mr. Lanigan's representation that Debtors had located an investor who would provide the funds needed to dispose of the case. It therefore continued the hearing to September 25, directing Mr. Lanigan to "get on the phone" with the lawyers for the Trustee and Creditor "and see what can be worked out." Mr. Lanigan did not follow the Court's instruction. There was nothing to work out. The lawyers contacted him, indicating they were "ready to make this happen for you," but they "heard nothing" in response.

On September 22, Debtors discharged Mr. Lanigan and hired Mr. DeCailly. That same day, Mr. DeCailly moved the Court to convert Debtors' case to a Chapter 11. The motion asserted nothing more than this: Debtors have an "absolute right" to convert their case, and conversion can "bring more value to the estate and pay a dividend to unsecured creditors."

Debtors were financially incapable of prosecuting a plan to confirmation and eventual consummation. According to their Chapter 7 petition and asset schedules, they had no cash on hand, no checking or savings accounts, nothing evidencing liquidity. Their income amounted to only $2,200 per month, derived for the most part from the sale of sod. For a plan to succeed, the liens Mr. Gilberti had recorded to secure claims amounting to $10,250,000 would have to be removed.[53] To remove them, adversarial proceedings would be necessary. Who would finance all of that? For Debtors to go forward under Chapter 11, someone would have to step in and provide the wherewithal. That Debtors lacked an investor willing to provide funds sufficient to underwrite the expense of removing Mr. Gilberti's liens, satisfy Creditor's judgment, cover the Trustee's expenses and legal fees, and pay the

---

[53] At the November 5, 2014 hearing on Debtors' motion for reconsideration, Creditor's attorney informed the Court that over the previous eighteen to twenty-four months, Mr. Gilberti had recorded liens against the property to secure claims of $70 million. Debtors' Schedule D listed a Gilberti Water Company claim of $10,250,000. *See supra* note 13 and accompanying text.

43

capital gains tax that would be assessed became crystal clear at the September 25 hearing.

At the outset of the hearing, Mr. DeCailly informed the Court that he had just advised the Trustee that the Compromise was out of the question; his clients wanted their case converted to Chapter 11. They had a buyer "willing to pay up to $3 million" for some of the land. He qualified his remark by saying, "I don't quite yet know what we're selling." If he was referring to the September 1 Agreement, he knew exactly what Debtors were selling because an attachment to the Agreement described it with specificity.

Mr. DeCailly needed more time. He "ha[dn't] had a chance to contact opposing counsel yet regarding the 3 million." And he "would like to get the full picture of who's involved in this case."

> [T]he schedules need to be looked at and they need to be redone. The Court had concern about filing proofs of claim. Well, as we know, if you convert it to 11, we can get a new proof of claim period. All the periods start over again . . . we can go forward [and will] have an opportunity to propose this sale and get the lienholder together with the buyer.

Mr. DeCailly was implying that Debtors' plan of reorganization depended on whether Creditor and Debtors' buyer could work out a deal in which Creditor released its lien on all 2,500 acres of the Property, and settled its claim of $4,267,436 for something "up to $3 million."

44

The Trustee's lawyer told the Court that Debtors were not proceeding in good faith and that if converted to Chapter 11, the case would wind up back in Chapter 7 due to Debtors' inability to present a feasible plan of reorganization. Creditor's lawyer went a step further, arguing that Debtors were abusing the bankruptcy process.

The Court found no merit in Debtors' motion. Debtors had no plan, "no purchase contract," no "offer . . . on the table today." *Marrama* controlled. Mr. DeCailly's presentation firmly established that his clients were not eligible to be Chapter 11 debtors.

### D.

The evidence of "cause" for rejecting Debtors' Motion to Convert is overwhelming. The motion was a sham, farcical on its face, and was filed for the sole purpose of thwarting Creditor's effort to obtain satisfaction of its judgment. Debtors had no plan and none on the horizon. Mr. DeCailly chose not to proffer the September 1 Agreement as a plan because it was patently unenforceable; it was illusory. The "earnest money" the LLCs deposited was "$ 0.00," and they were not obligated to complete the transaction unless they found "financing acceptable to purchaser." The LLCs could take it or leave it at their own whim. Assuming the Agreement's enforceability, Debtors could not deliver a marketable title.

45

In fact, Debtors' prospects for producing a plan that could be confirmed were nil. Cause for denying the Motion to Convert therefore existed under § 1112(b)(4)(M). Cause existed under (b)(4)(E) and (H) as well. Debtors, either personally or through counsel, failed to comply with Court orders and, despite repeated requests from the Trustee, refused to amend their schedules. Finally, Debtors filed their Motion to Convert in bad faith, which constitutes cause.[54]

The filing was just one more step in Debtors' continuing abuse of the bankruptcy process. Their strategy was to delay the process indefinitely. As Mr. DeCailly said at the September 25 hearing, he needed time "to contact opposing counsel . . . regarding that 3 million," time "to get a full picture of who's involved in this case," and time to look at the schedules because "they need to be redone." And with conversion to Chapter 11, "we get a new proof of claim period. All the periods start over again . . . then we'll know everybody involved and we will have an opportunity to propose this sale and get the lienholder together with the buyer."

Section 105(a) of the Code authorized the Court to prevent this kind of intentional abuse of the bankruptcy system by denying the motion.[55] *See*

---

[54] The Bankruptcy Court did not rely on bad faith as a cause for denying the motion. For that reason, the District Court did not consider it. We exercise our authority to affirm a district court decision on a ground the court did not rely on, *see Waldman v. Conway*, 871 F.3d 1283, 1289 (11th Cir. 2017) (per curiam), and do so additionally on the ground of bad faith.

[55] 11 U.S.C. § 105(a) provides that:

*Marrama*, 549 U.S. at 375, 127 S. Ct. at 1112 (concluding that the authority granted to bankruptcy judges under § 105(a) to take any action necessary to prevent an abuse of process "is surely adequate to authorize an immediate denial of a motion to convert filed under § 706").

In addition to Debtors' bad faith, other § 1112(b)(4) causes required the denial of conversion to Chapter 11. Debtors failed to demonstrate a reasonable likelihood of success under Chapter 11. And they deliberately refused to amend their schedules as instructed repeatedly by the Court. They knew all along of the importance of amending their schedules. The unsecured creditors had not been identified. The case could not go forward without disclosing their identities.

IV.

Federal Rule of Bankruptcy Procedure 9023 provided the procedural basis for Debtors' motion for reconsideration. The rule states that Federal Rule of Civil Procedure 59 "applies in cases under the Code. A motion . . . to alter or amend a judgment shall be filed, and a court may on its own order a new trial, no later than

---

(a) The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

14 days after entry of judgment."[56]  On October 17, 2014, Debtors moved the

Bankruptcy Court for reconsideration of its order of October 3 denying their

Motion to Convert.  Although the motion did not cite Rule 9023 or Rule 59, it is

apparent that it was brought under Rule 59(e), "Motion to Alter or Amend a

Judgment."

> Only three grounds are available to support the motion: (1) manifest error of fact; (2) manifest error of law; or (3) newly discovered evidence. A motion for reconsideration is not a vehicle to re-argue issues resolved by the court's decision or to make additional argument on matters not previously raised by counsel.

*In re Inv'rs Fla. Aggressive Growth Fund, Ltd.*, 168 B.R. 760, 768 (Bankr. N.D.

Fla. 1994) (citations omitted).

Debtors' motion was based on two documents that were being disclosed to

the Court for the first time, the September 1 Agreement and the October 14

Agreement, both made with the LLCs whose identity was being made known to

the Court, the Trustee, the U.S. Trustee, and Creditor also for the first time.  Rule

59(e) motions are "aimed at reconsideration, not initial consideration."  *FDIC v.*

*World Univ. Inc.*, 978 F.2d 10, 16 (1st Cir. 1992) (internal quotation marks

omitted).  The September 1 Agreement was not "newly discovered evidence."  Mr.

DeCailly had it in his possession prior to the September 25 hearing, but chose not

---

[56] Rule 59 does not apply where a party in interest moves "for reconsideration of an order allowing or disallowing a claim against the estate."  *See* Fed. R. Bankr. P. 3008.

to disclose it.  The September 1 Agreement was worthless.  What Debtors wanted

the Court to consider was the October 14 Agreement.  The Court could have

denied the motion for reconsideration on the ground that it was not a motion for

reconsideration at all.  It was a new motion to convert the case to Chapter 11.[57]

But instead of denying the motion, the Court set it for a hearing on November 5.

The proposed plan was the October 14 Agreement.  The LLCs would

purchase all but 160 acres of the Property for $4,621,000.  Mr. DeCailly told the

Court that the deal could be closed "within 15 days."[58]  He said that even though

he had not complied with the Court's order that he obtain Debtors' amendments to

their schedules.[59]  Nor had he determined Debtors' tax basis in the Property.  The

---

[57] The filing of the motion constituted an abuse of the bankruptcy process and for that reason could have been stricken pursuant to 11 U.S.C. § 105(a).

[58] Under no circumstances could the sale of the Property be closed within fifteen days. The October 14 Agreement's closing provision is contained in the "Addendum to Vacant Land Contract."  The provision states the following:

> The Closing Date shall be fifteen (15) business days after the entry of the Sale Order, in such a manner as to allow Seller to deliver to Buyer at Closing good, marketable title to the Property as warranted in this Contract, unencumbered by any claims, including but not limited to those of 72 Partners, LLC, and any claims arising out of the transaction pursuant to which Joseph D. Gilberti, Jr. ("Gilberti") received and recorded a deed to the portion of the Property in Parcel numbers 1009-00-1000 and 1011-00-1010, and any other claims of Gilberti or Gilberti Water Company, or any other party or entity related or associated with any of the parties mentioned above or any other claimants.

The transaction could not close without the cancelation of the deed to Gilberti and the removal of liens he recorded to secure upwards of $70 million of claims.  Otherwise, Debtors could not deliver good, marketable title to the Property.

[59] He admitted that twenty-seven unsecured creditors needed to be listed.

49

Trustee's attorney pointed out that $4,621,000 would not cover Creditor's secured claim, the expenses associated with administering the estate, and the capital gains tax that would be imposed. In addition to this, Debtors would have to finance the litigation Mr. DeCailly acknowledged would be necessary to remove Mr. Gilberti's now $70 million worth of liens on the Property. Debtors lacked the ability to finance that litigation or underwrite the expenditures that would be incurred in bringing their proposed plan to fruition. Implicit in Mr. DeCailly's response to this, therefore, was that a third party, the LLCs or their financier, would provide the necessary funds.

The Court's response was that if conversion was granted, the plan Mr. DeCailly outlined would fail, Debtors would be back in Chapter 7, the Property would be foreclosed upon, and Debtors would be left with nothing: "They wouldn't have . . . their homestead [or] their well." The Court therefore denied Debtors' motion for reconsideration.

Assuming the Court was treating the motion for reconsideration as a new effort to convert the case to a Chapter 11, there were ample reasons to deny it. All of the causes that warranted the denial of the Motion to Convert were present. Thus, the District Court properly affirmed the Bankruptcy Court's orders of October 3 and November 18.

V.

Debtors begin their challenge to the Bankruptcy Court's Compromise ruling with a question. "The Trustee disposed of $10,000,000.00 worth of prime Florida farm land for $300,000.00 to pay a $2,100.00 unsecured claim, and thousands in administrative expenses, just to give back to the party who paid the $300,000.00 more than 75% of the original money paid. Why?"  Debtors' answer:

> It is simple, had the Court just lifted the stay and allowed the secured creditor to proceed with the foreclosure sale, the secured creditors spoils would have been strictly limited to the amount of its judgment, however, by buying $10,000,000.00 worth of property for $300,000.00 the creditor's spoils far exceeds what they were actually entitled to under their judgment.  It was a brilliant scheme between the Trustee and the Creditor. That is how the Creditor received its windfall, the Trustee also unjustly financially benefited due to the fact that he created a $300,000.00 estate to pay one unsecured creditor with a $2,100.00 claim.  Now, the trustee fees are based upon the disbursements to creditors, not on gross assets collected.  Therefore, the Trustee traded $10,000,000.00 worth of real estate for $300,000.00 but only had one $2,100.00 unsecured creditor to pay, so he and the creditor cooked up the kickback by including in the compromise a $240,000.00 unsecured claim kick back to the Creditor who paid the $300,000.00. Now the Trustee can pay his administrative fees, attorney fee, take his bloated trustee fee and give back a large portion of the $300,000 back to the Creditor.

What Debtors seem to be saying is this: in approving the Compromise, the Court allowed Creditor to acquire the property (2,500 acres less 160 set aside for the homestead) for $240,000, i.e., $300,000 less $60,000 for payments to unsecured creditors.  Creditor presumably acquired the Property under the Trustee's quitclaim

51

deed.[60]  Instead of approving the Compromise, Debtors continue, the Court should have rejected it and allowed the foreclosure sale to go forward.  This, in Debtors' mind, would have "strictly limited" Creditor's "spoils" to "the amount of its judgment."  At the sale, a third party, like the LLCs, would have submitted a bid in an amount in excess of Creditor's judgment, thus satisfying the judgment in full.[61]  The Clerk, in turn, would have given the successful bidder a deed to the Property, all 2,500 acres, rather than carving out 160 acres for the homestead.  As the Bankruptcy Court stated at the November 5 hearing, if it did not approve the Compromise, Debtors would be faced with "[t]he foreclosure of the property, so they would have had nothing.  They wouldn't have had their homestead.  They wouldn't have had their well."  The District Court agreed.

The Court did lift the stay, but it did so as provided in the Compromise.  Creditor could not obtain clear title to the 2,340 acres described in the Trustee's

---

[60] The Trustee's quitclaim deed would convey to Creditor the estate's interest in the 2,340 acres, but the land would be subject to The Gilberti Water Company liens, which at latest count secured claims of $70 million, *see supra* notes 13 and 24.  In exchange, Creditor would pay the Trustee $300,000 for distribution to general unsecured creditors, including Creditor.

[61] As Mr. DeCailly informed the Court at the November 5, 2014 hearing, Debtors wanted the Property (less 160 acres) to go to the LLCs, who were willing to pay $4,621,000 for it—that if the Property "cannot stay . . . in their family, then they want to see it stay with the neighbor who's been there generation after generation."

quitclaim deed unless the foreclosure sale went forward.[62]  At the sale, Creditor would presumably bid the amount of its judgment, and if a third party such as the LLCs appeared to bid a sum in excess of that amount, Creditor would wind up with the 2,340 acres conveyed via a deed from the Clerk.  At the end of the day, Creditor or a third party would acquire the 2,340 acres, and Debtors would have their homestead.  As a matter of conscience if nothing else, the Bankruptcy Court, in the exercise of its discretion, had to approve the Compromise.  And the District Court had to approve its decision.

## VI.

For all the reasons above, the judgment of the District Court is

**AFFIRMED.**

---

[62] As the Compromise provided, Creditor's judgment lien would be lifted with respect to the 160 acres set aside for Debtors' homestead.  Thus, the public foreclosure sale would involve only 2,340 acres of the property.